1  Alan E. Wisotsky (SBN 68051)
   Jeffrey Held (SBN 106991)
2  LAW OFFICES OF ALAN E. WISOTSKY
   300 Esplanade Drive, Suite 1500
3  Oxnard, California  93036
   Tel:    (805) 278-0920
4  Fax:    (805) 278-0289
   E-mail:  lawyers@wisotskylaw.com
5
   Attorneys for Defendants COUNTY OF
6  VENTURA, VENTURA COUNTY SHERIFF'S
   DEPARTMENT, and SHERIFF BOB BROOKS
7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JOHN W. BIRGES, an individual, )   No. CV 09-01249 SJO (SSx)
                                    )
12            Plaintiff,            )   **DEFENDANTS' MEMORANDUM OF**
                                    )   **CONTENTIONS OF FACT AND LAW**
13       v.                         )   **PURSUANT TO CENTRAL**
                                    )   **DISTRICT LOCAL RULE 16-4**
14  COUNTY OF VENTURA, VENTURA      )
    COUNTY SHERIFF'S DEPARTMENT,    )
15  VENTURA COUNTY SHERIFF BOB      )   **DATE:      05/10/10**
    BROOKS, an individual,          )   **TIME:      9:00 A.M.**
16  CALIFORNIA FORENSIC MEDICAL     )   **CTRM:      880, ROYBAL**
    GROUP, JOHN KORZELIUS, and      )
17  DOES 1-100,                     )
                                    )
18            Defendants.           )
                                    )
19  _____ )

20       In  accordance  with  Central  District  Local  Rule  16-4.1

21  defendants hereby submit the following memorandum of contentions of

22  fact and law.

23                              **I.**

24       **SUMMARY STATEMENT OF PLAINTIFF'S CLAIMS**

25       Plaintiff claims that while incarcerated in the Ventura County

26  Jail, he was attacked by three inmates.  He claims that the jail

27  should have protected him and provided better medical care in the

28  aftermath of the attack, which broke his jaw.

                              1

1

**II.**

2

**DEFENDANTS' STATEMENT OF THE CASE**

3 A.   Facts:

4      Plaintiff was an inmate at the Todd Road Jail facility

5 operated by the Ventura County Sheriff's Department and staffed,

6 for medical purposes, by an independent medical contract services

7 provider retained by the Ventura County Sheriff's Department,

8 California Forensic Medical Group.  He had been incarcerated for

9 three weeks in the Todd Road Jail.  On February 24, 2008, plaintiff

10 made an intemperate remark to an inmate named Jose Mejia

11 denigrating his chess-playing ability when he saw another inmate

12 checkmate inmate Mejia.  Plaintiff began laughing and said either,

13 "You let this guy beat you?" or "You let this dumb ass beat you?"

14      Plaintiff immediately realized that telling someone that he

15 was inferior in a mental matchup was not wise.  He also immediately

16 realized that it had been injudicious of him to poke fun at an

17 Hispanic inmate who would likely be inculturated to react to any

18 denigrating insults to male prowess.  He also soon understood that

19 his misguided effort to establish bonding camaraderie with the

20 losing inmate was problematic because he had inadvertently insulted

21 a member of a significant jail inmate power block.

22      Plaintiff quickly apologized for showing what could be

23 considered disrespect for inmate Mejia.  He told him that he had

24 not intended to show him disrespect.

25      Inmate Mejia was not placated by the apology.  He fixed

26 plaintiff's gaze and glared at him.  He was obviously taking it

27 much more seriously than plaintiff had ever intended.  Plaintiff

28 soon realized that inmate Mejia was quite angry and primed to react

1  adversely.

2      This was novel behavior on the part of inmate Mejia.
3  Plaintiff had been housed with these same inmates for three weeks
4  and spent four hours per day with them in the communal dayroom.
5  During that time, there were no problems or altercations with any
6  of the inmates at the Todd Road Jail.  Plaintiff had been housed
7  with the three inmates who attacked him for those same three weeks
8  and four hours per day of communal dayroom time before they
9  attacked him, again fully without incident, altercation, or threat.

10      Inmate Mejia approached plaintiff a few minutes after the
11  laughing comment about being checkmated by an inmate generally
12  regarded to be the worst chess player in the cell block.  Inmate
13  Mejia told plaintiff that he would expect disrespect reparations,
14  stating that "You need to start kicking me down canteen every
15  week."  Plaintiff did not react well to the implicit threat of
16  retribution if he did not share his commissary with inmate Mejia in
17  satisfaction of the disrespect reparations request.  Plaintiff told
18  inmate Mejia words to the effect of "Fuck off — go to hell."
19  Inmate Mejia approached plaintiff again a few minutes later, giving
20  him a second chance to rethink his profane rejection of the
21  disrespect reparations commissary demand.  Plaintiff again rejected
22  the demand.

23      Within seconds, plaintiff felt himself being rushed from
24  behind by other inmates, the recipient of a flurry of blows from
25  fists.  He thought that the primary attack came from behind and
26  believes that inmate Mejia instigated the attack upon him but
27  probably did not directly participate in the delivery of blows.

28      Plaintiff received multiple blows from the inmates.  One

connected hard with his jaw when he dropped his guard in a vain effort to strike back.  The entire attack was fairly brief, lasting perhaps 10 to 15 seconds.

No guard or jail official attacked plaintiff.  Plaintiff never notified any custody deputy or jail official of any fear or concern at any time before the three inmates attacked him (plaintiff's deposition, Exhibit A, p. 157:3-6).

Custody staff took prompt action.  As soon as plaintiff's jaw was struck, a custody deputy came on the public address system in the cell block and ordered lockdown.  No blows were thrown at plaintiff after that.

No deputy or jail official was aware of the events preceding the attack upon plaintiff, such as the chess game comment or inmate Mejia's two demands that plaintiff give him part of his commissary in reparation for the disrespectful laughter and comment. Plaintiff has stated that the attack upon him was sudden and unexpected (p. 157:7-9).

In addition to faulting the jail for not preventing the attack (second amended complaint, p. 7:1-3), plaintiff likewise faults the medical staff at the jail for not taking good medical care of him after his beating (second amended complaint, p. 4:22-24).  The facts in this regard indicate that plaintiff did receive substantial and significant medical care in the wake of the attack upon him.

On the day of the attack, a jail nurse examined plaintiff.  In fact, she examined him immediately after the attack.  She palpated plaintiff's jaw and said, "I don't think it's broken.  I think it's just swollen."

1     The nurse involved a doctor who ordered a series of jaw

2  X-rays.  These were taken the very first thing on the morning after

3  the attack.

4     Two days after the attack, the X-ray results were obtained and

5  revealed that plaintiff had, in fact, suffered a fractured jaw.  He

6  was told the same day that his jaw was fractured.  That was when

7  he first learned that his jaw was broken.  It was at that time that

8  plaintiff first requested more advanced medical care for his broken

9  jaw.

10     On February 28, 2008, two days after the X-rays became

11  available and plaintiff requested more advanced medical care,

12  plaintiff was transported to see a Dr. Lopez.  Dr. Lopez is an oral

13  maxillofacial surgeon under contract with the Ventura County Jail

14  to provide services to inmates.  Dr. Lopez repaired plaintiff's

15  broken jaw by installing a series of mandibular guide wires.

16     Plaintiff was given continuous post-surgical analgesics once

17  the anesthesia wore off.  A few days after Dr. Lopez installed the

18  guide wires in plaintiff's jaw, the wires loosened, especially on

19  the left side, cutting plaintiff's mouth and gums.  A nurse packed

20  plaintiff's mouth with gauze to keep the loose wires from making

21  contact with the inside of his cheeks.  Dr. Lopez repaired the

22  problem of the failed guide wires in plaintiff's jaw a few days

23  after they became loosened by using rubber bands.

24     Plaintiff was asked in his deposition, page 169, lines 23-25,

25  "Was there anything in your opinion which the guards or the custody

26  deputies could have done to have preempted the attack of the

27  inmates upon you?"  On page 170 at line 1 he answered, "No."

28  / / /

Plaintiff was asked at pages 179 and 180 of his deposition whether the absence of surgical care for his jaw between the time of the attack and the oral maxillofacial surgery four days later worsened his condition beyond the damage done in the attack by the inmates.  He stated, "I don't think so" (p. 179:14-25, p. 180:1).

The second amended complaint is configured in ten causes of action.  The first three are brought under the federal civil rights statute, 42 U.S.C. §1983.  The other seven causes of action, 4 through 10, are brought under various state-law theories of recovery.  All of the causes of action, however, derive from the same common nucleus of operative facts as described above and as sourced in the concurrently filed statement of uncontroverted facts/separate statement of undisputed facts.

Defendants contend that summary judgment is appropriate based upon a number of legal doctrines.  These are set out below.

There is no federal liability for the inmate-on-inmate attack because there was no subjective deliberate indifference.  Extensive appellate precedent now clarifies that for purposes of §1983 analysis, there are, broadly speaking, two forms of official conduct.  One involves direct contact by the public officials, such as excessive force allegations.  The second category involves situations in which the officials did not make any contact with plaintiff but, rather, are sought to be made liable for the actions of others or for not doing enough.  The case law now clarifies that in the second category of situations, which would certainly encompass an inmate-on-inmate attack, there is a high conduct fault standard characterized as subjective deliberate indifference.  This culpability standard means willful blindness to impending serious

1   harm which is easily preventable.   Considering that plaintiff
2   testified that there was nothing that the deputies could have done
3   to have preempted the attack of the inmates upon him (p. 169:23-24,
4   p. 170: 1), there is not even negligence, much less subjective
5   deliberate indifference.

6      The Ninth Circuit has held that jail medical personnel are
7   judged by the conduct fault standard of subjective deliberate
8   indifference as well.  In view of the facts that plaintiff was seen
9   by the nurse immediately, X-rays were obtained the very next
10  morning, and oral maxillofacial surgery was performed two days
11  after X-ray results became available, involving installation of
12  mandibular guide wires, it cannot be said that there was anything
13  even remotely approaching insouciance on the part of the jail
14  medical provider.

15     The third basis for this motion is the absence of proximate
16  causation.  Plaintiff has testified that there was nothing that the
17  deputies could have done to have averted the attack upon him, which
18  was sudden and was caused by his own ill-timed remark to inmate
19  Mejia.  Plaintiff has also testified that the time between the
20  attack and the installation of mandibular guide wires by the oral
21  maxillofacial surgeon, Lopez, did not worsen his condition beyond
22  that injury sustained in the attack by the inmates (p. 179:14-25,
23  p. 180:1-3).  Plaintiff has also testified that when the left-side
24  wires became loose, they were replaced with rubber band fasteners
25  a few days later.

26     A separate basis for this motion on behalf of the Sheriff and
27  his department is that under United States and California Supreme
28  Court decisions, the Sheriff is a state official who enjoys the

protection of the absolute damages immunity of the Eleventh Amendment.  The Sheriff's Department is similarly considered a state agency subject to the Eleventh Amendment immunity.

The County of Ventura is not liable because it cannot control the operation of a state official, the Sheriff, or a state agency, the Sheriff's Department.  The County cannot have been a policymaker for an agency and official which were arms of state government and over which the County had no operational control.

Turning to the state-law causes of action, there is no evidence of fault in this case.  No matter how the theories are denominated, or into which causes of action they are sought to be forced, there is simply no evidence of fault and no triable issue of misconduct as to any of the defendants.

State law likewise makes proximate causation an indispensable element of every cause of action.  Its absence dooms the seven state-law theories, as well as the federal counts.

Finally, under a California Government Code section, public entities cannot be liable for injuries to jail inmates.  Therefore, the state-law causes of action fail against the County of Ventura, the Ventura County Sheriff's Department, and Ventura County Sheriff Bob Brooks based upon that immunity.

B.   Subjective Deliberate Indifference Is the Culpability

Standard for Jails and Jailers in §1983 Cases:

Pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, and the Ninth Circuit applies the same standards for analysis. *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).  The fact that deliberate indifference is the culpability standard used to measure

violations of the Eighth Amendment's prohibition of cruel and unusual punishment does not mean that it applies only to persons who may be punished. *Redman v. County of San Diego*, 942 F.2d 1435, 1442 (9th Cir. 1991). Therefore, a prisoner's status as a pretrial detainee who may not be punished does not preclude application of the standard. It is not inappropriate that the same standard is used under both the Fourteenth and Eighth amendments. 942 F.2d at 1442. The landmark United States Supreme Court decision addressing the issue of whether the jail culpability standard under §1983 is subjective deliberate indifference or objective deliberate indifference is *Farmer v. Brennan*, 511 U.S. 825 (1994). Subjective deliberate indifference, as used in the criminal law, is the test for whether prison authorities have acted with deliberate indifference toward prisoners. The test is not an objective one but, rather, a subjective standard. *Farmer* mandates inquiry into a jail official's mental state. 511 U.S. at 838. When addressing "levels of blameworthiness," it is "no accident" that §1983 "suits against prison officials must satisfy a subjective requirement." *Id.* The *Farmer* Court wrote:

> To be sure, the reasons for focusing on what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be), differ in the Eighth Amendment context from that of the criminal law. Here, a subjective approach isolates those who inflict punishment; there, it isolates those against whom punishment should be inflicted. But the result is the same: to act recklessly in either

1          setting a person must consciously disregard a

2          substantial risk of serious harm.

3 511 U.S. at 839.

4     The civil law generally calls a person reckless who acts or,

5 having a duty to act, fails to act, in the face of an unjustifiably

6 high risk of harm which is either known or so obvious that

7 it should have been known.  In contrast, the criminal law generally

8 permits a finding of recklessness only when a person disregards a

9 risk of harm of which he is actually aware.  The *Farmer* Court

10 explained, "The standards proposed by the parties in this case

11 track the two approaches (though the parties do not put it that

12 way): petitioner asks us to define deliberate indifference as what

13 we have called civil-law recklessness, and respondents urge us to

14 adopt an approach consistent with recklessness in the criminal

15 law."  511 U.S. at 837.

16     The *Farmer* Court held, "But an official's failure to alleviate

17 a significant risk that he should have perceived but did not, while

18 no cause for commendation, cannot under our cases be condemned as

19 the infliction of punishment."  511 U.S. at 838.  The *Farmer*

20 holding is capsulized at 847, where the Court stated, "Accordingly,

21 we reject petitioner's [plaintiff's] arguments and hold that a

22 prison official may be held liable under the Eighth Amendment for

23 denying humane conditions of confinement only if he knows that

24 inmates face a substantial risk of serious harm and disregards that

25 risk by failing to take reasonable measures to abate it."

26     This mental state requires that a jail official or officials

27 acted or failed to act while actually aware of a substantial risk

28 that serious inmate harm would result.  *Salahuddin v. Goord*,

467 F.3d 263, 280 (2d Cir. 2006).   As used in this context, deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in the criminal law.  *Id*.

In the facts of this case, as agreed to by plaintiff in his deposition, he intemperately ridiculed another inmate for losing at a chess game to an individual whom plaintiff characterized as "a dumb ass."  Plaintiff laughed at the losing inmate as he said so. This ridicule, according to plaintiff, was ill advised and directly triggered the attack upon him.  The entire attack only lasted 10 or 15 seconds.  The deputies stopped it very promptly, at the moment plaintiff was struck in the jaw.  The deputies, plaintiff admits, had no knowledge of the brewing circumstances, the chess game, the insult, the losing inmate's reparations demand, or any of the circumstances of the impending attack.  It was a spontaneous random act of criminal violence.  Therefore, the deputies could not have been subjectively deliberately indifferent because they knew of no risk so it cannot even be analyzed as to whether they should have done something about a situation of which they were unaware.

Both the Supreme Court and the Ninth Circuit have sympathized with the jail's "unenviable task of keeping dangerous men in safe custody under humane conditions."  *Farmer v. Brennan, supra,* 511 U.S. at 845; *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979).  The second amended complaint argues that it was wrong of the jail officials to incarcerate plaintiff with violent men who were Hispanic gang members.  (Complaint, p . 6:28, p. 7:1-2.)

The first problem with this contention is that it is not factually accurate; plaintiff has clearly testified in his deposition that for three weeks previously (84 hours), he mingled

safely with those same inmates who attacked him. (Plaintiff's deposition, Exhibit A, p. 85:24-25; p. 86:1-3; p. 154:20-25; p. 155:1-25; p. 156:8-24.) A second problem is that identified by the Supreme Court in *Farmer* and the Ninth Circuit in *Spain*; jails are definitionally comprised of people who have a great deal of trouble managing their anger. The Ninth Circuit has observed that profane threats and insults are a constant daily ritual in this nation's prisons. *Somers v. Thurman*, 109 F.3d 614, 622 (9th Cir. 1997).

A third problem with the argument that race or ethnicity should be a separation or segregation basis in jails has been rejected by the United States Supreme Court. The high Court has held that race has no place in American life and law and that that maxim is just as applicable to incarceration facilities as it is to school districts. In *Johnson v. California*, 543 U.S. 499 (2005), the Supreme Court held that a jail policy of deliberately placing inmates with cellmates of the same race is facially unconstitutional. The strict scrutiny standard of review, rather than the more lenient "reasonably related to a legitimate penological interest" standard, governed a segregated inmate's challenge. In order to justify government-imposed racial or ethnic classification, the government would need to surmount an equal protection challenge by proving that the race-based classification was narrowly tailored to further a compelling governmental interest or interests.

/ / /

/ / /

/ / /

C.   <u>Allegations That Jail Medical Providers Are Liable under</u>
     <u>§1983 Are Likewise Evaluated under the Subjective</u>
     <u>Deliberate Indifference Culpability Standard:</u>

In *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004), the estate of a prisoner brought a civil rights action alleging that a jail physician was deliberately indifferent to the prisoner's serious medical needs. Summary judgment was affirmed. A prison official acts with deliberate indifference only if the official knows of and disregards an excessive risk to inmate health and safety. 391 F.3d at 1057. Under this standard, the prison official must not only be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, but that person must also draw the inference. *Id*. If a jail official should have been aware of the risk, but was not, then the official has not violated the Constitution "no matter how severe the risk." *Id*. This subjective approach focuses only upon what a defendant's mental attitude actually was. *Id*. Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's constitutional rights. *Id*.

The plaintiff in *Toguchi* made many allegations of improper conduct by the jail doctor. For instance, the claim was made that the physician had treated the prisoner for a substantial period of time and had extensive knowledge of his medical history and prior behavior. Her decision not to conduct a differential diagnosis did create a substantial risk of serious harm, but she was not subjectively aware of that risk. She was convinced that her diagnosis was correct. 391 F.3d at 1060. She also did not bother to ascertain whether the plaintiffs' decedent's bizarre behavior

could be the result of a drug overdose.  But she subjectively did not believe that he would have had access to contraband narcotics while in prison.  It does not matter whether her assumptions and conclusions were reasonable or not — "Rather, so long as she was not subjectively aware of the risk that Keane could be suffering from a drug overdose, and disregarded that risk, she was not deliberately indifferent."  *Id.*

While the Eighth Amendment may not, strictly speaking, be applicable to pretrial detainees, in the context of a claim for deliberate indifference to the medical needs of a state pretrial detainee, the due process clause of the Fourteenth Amendment requires no more than the Eighth Amendment does in the case of a convicted prisoner.  *Caiozzo v. Koreman*, 581 F.3d 63, 70-71 (2d Cir. 2009).  That court held that it is a "logical extension of the principles recognized in *Farmer* that an injured state pretrial detainee, to establish a violation of his Fourteenth Amendment due process rights, must prove, *inter alia*, that the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware."  *Id*. at 71.   The *Caiozzo* court concluded:

> We thus reaffirm the position that we expressed in *Arroyo*: Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.  Because the Supreme

14

1            Court in *Farmer* articulated the proper
2            standard for analyzing such claims under the
3            Eighth Amendment . . . we adopt that standard
4            in this case under the Due Process Clause of
5            the Fourteenth Amendment.
6   581 F.3d at 72.

7        The *Caiozzo* court held that a jail nurse was not deliberately
8   indifferent to a detainee's serious medical condition of alcohol
9   withdrawal.  The burden of proof was on the estate — the plaintiff.
10  It was required to prove that the defendants disregarded a
11  significant risk of harm to the detainee of which the defendants
12  were actually aware.

13       In the present case, plaintiff was seen by the jail nurse on
14  the same day as he was attacked — he has testified immediately
15  after the attack.  She examined him and palpated his jaw.  She
16  expressed her opinion about that.  To double-check her opinion, she
17  consulted a doctor assigned to the jail, who ordered a series of
18  mandibular X-rays.  These were carried out the very next morning.

19       The results were obtained two days later.  Plaintiff was
20  immediately informed.  That was the first time that he requested
21  medical attention to his jaw.  He was scheduled for oral maxillo-
22  facial surgery with Dr. Lopez.  Two days after the diagnosis, Dr.
23  Lopez implanted mandibular guide wires.

24       Analgesics were immediately and continuously given.  A few
25  days after the surgery, the wires on the left side loosened,
26  cutting the inside of plaintiff's mouth.  A nurse packed the inside
27  of his mouth with gauze to shield it.  Within a few days, the
28  situation was repaired by installation of mandibular rubber guides.

1    There was no insouciance here.  Therefore, the defendants are

2   not liable to the plaintiff because there is no evidence of

3   subjective deliberate indifference, a high culpability standard.

4   California Forensic Medical Group and its physician, John

5   Korzelius, are not liable.  Neither of these, either singly or in

6   combination, cavalierly turned a blind eye to approaching serious

7   danger.

8   D.   The Entity Defendants Cannot Be Liable Both Because There

9        Was No Subjective Deliberate Indifference and Because No

10       Individual Defendant Is or Could Be Liable under These

11       Facts:

12       Other than Dr. Korzelius, the plaintiff has chosen not to name

13   any individual defendants.  The deadline to do so elapsed on

14   September 30, 2009 (docket entry 19).  A civil rights plaintiff

15   cannot circumvent elements of a cause of action or culpability

16   standard simply by omitting inclusion of individual defendants and

17   skipping right to the entity defendants.  A plaintiff cannot use

18   the sleight of hand of not including or dismissing individual

19   public functionaries and then proceed to try to substitute a

20   different culpability standard arguably applicable to the public

21   entity.  *Quintanilla v. City of Downey*, 84 F.3d 353, 356 (9th Cir.

22   1996).  Under the United States Supreme Court decision in *City of*

23   *Los Angeles v. Heller*, 475 U.S. 796 (1986), as well as under

24   general principles of §1983 liability, a plaintiff may recover only

25   when that individual's federal civil rights have been violated.

26   *Quintanilla* at 356.  Case law does not authorize the award of

27   damages against a municipality based upon the actions of its

28   officers or agents when they themselves inflicted no constitutional

1  harm under the applicable standards.  *Scott v. Henrich*, 39 F.3d
2  912, 916 (9th Cir. 1994).

3  E.   <u>There Is No Proximate Causation Between Any of the</u>
4       <u>Defendants' Conduct and Plaintiff's Harm:</u>

5       Proximate causation remains an indispensable element of a
6  cause of action and in fact is a necessary prerequisite for the
7  jurisdiction of an Article III federal court.  Without a fairly
8  traceable connection between the conduct complained of and the harm
9  suffered, there is no causation and, therefore, there is no
10 redressability.  *Steel Co. v. Citizens*, 523 U.S. 83, 103 (1998).
11 The irreducible constitutional minimum of standing contains three
12 requirements.  The second of these is that there "must be causation
13 — a fairly traceable connection between the plaintiff's injury and
14 the complained-of conduct of the defendant."  523 U.S. at 103.
15 This triad of injury in fact, causation, and redressability
16 constitutes the core of Article III's case or controversy
17 requirement, and the party invoking federal jurisdiction bears the
18 burden of establishing the triad's existence, when challenged to do
19 so, such as by motion.

20      The circuits have held that tenuous or marginal connections
21 are insufficient.  If there is a fairly strong, efficient
22 intervening cause, or no connection, then proximate causation is
23 missing and the action must fail as against the civil rights
24 defendant.  In *Gini v. Las Vegas Metropolitan Police Department*,
25 40 F.3d 1041, 1044 (9th Cir. 1994), causation was defined in terms
26 of reasonable foreseeability.  If a defendant could not reasonably
27 foresee that his conduct would cause the injury complained of, no
28 claim is stated.

In *Cameron v. City of Pontiac*, 813 F.2d 782 (6th Cir. 1987), police officers were shooting at a fleeing burglary suspect. In order to escape their gunshots, he scaled a fence onto a freeway and was struck by a passing vehicle. The court held that the pretrial dismissal motion was properly granted because the alleged constitutional violation was not the proximate cause of the person's death.

Proximate cause is an indispensable element of a state-law cause of action. *Andrews v. Wells*, 204 Cal.App.3d 533, 538 (1988). That is as true for exotic torts as for garden-variety negligence. Causation or its absence is ascertainable as a matter of law, even in complex cases. *Cottle v. Superior Court*, 3 Cal.App.4th 1367, 1384-85 (1992).

In this case, plaintiff was specifically asked during his deposition whether there was anything in his opinion which the guards or custody deputies could have done to have preempted the attack of the inmates upon him. He answered "No" (p. 169:23-25; p. 170:1). As to the four days between the attack and the oral maxillofacial surgery, he was asked whether that time period caused any worsening of the jaw condition beyond that already inflicted by the inmates' beating. He said that there was not (p. 179:14-25; p. 180:1-3). Therefore, nothing that the defendants did or failed to do caused the plaintiff any cognizable injury.

F.    Under *Mcmillian-venegas*, a Sheriff Is a State Official, and His or Her Agency Is a State Agency Subject to the Absolute Eleventh Amendment Damages Immunity:

In *McMillian v. Monroe County, Alabama*, 520 U.S. 781 (1997), the Supreme Court held that a county sheriff in Alabama was a state

official when acting in his law enforcement capacity.  States and state officials sued in their official capacity are not considered persons who can be sued in either federal or state court for damages under §1983.  *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989).

The question of whether a sheriff and his or her department are state or local officials for Eleventh Amendment immunity purposes remained open in California until the Court of Appeal held that in setting policies concerning county jails, the sheriff acts as an immune state officer.  He is performing state law enforcement duties when operating the jail.  *County of Los Angeles v. Superior Court (Peters),* 68 Cal.App.4th 1166 (1998).

The Ninth Circuit addressed the issue on several occasions in 2001, including *Streit v. County of Los Angeles*, 236 F.3d 552 (9th Cir. 2001).  In that case, the sheriff and his department argued that they functioned as state officials or state entities, rather than county officials or entities, when engaged in law enforcement functions and therefore claimed that they could not be successfully sued under §1983 for the alleged constitutional torts of the deputies.  The moving parties contended that they were an arm of state government and were not persons within the meaning of §1983.  The Ninth Circuit disagreed.

The United States Supreme Court has held that a state Supreme Court remains the ultimate arbiter of the law of that state.  The United States Supreme Court explained:

> Neither this Court nor any other federal tribunal has any authority to place a construction on a state statute different from

1                    the one rendered by the highest court of the

2                    State.  . . . This proposition, fundamental

3                    to our system of federalism, is applicable to

4                    procedural as well as substantive rules.

5  *Johnson v. Fankell*, 520 U.S. 911, 916 (1997).

6       The Ninth Circuit has explained that it is "bound by the

7  decisions of the [state] Court of Appeals absent convincing

8  evidence that the [state] Supreme Court would decide the matter

9  differently."  *Green v. City of Tucson*, 340 F.3d 891, 899, n.10

10 (9th Cir. 2003).  A state Supreme Court's construction of state law

11 is binding upon federal courts.  *Jones v. Bates*, 127 F.3d 839, 856

12 (9th Cir. 1997) ["No federal court except for the United States

13 Supreme Court has appellate jurisdiction over final decisions of

14 the California Supreme Court."].

15      Subsequent to *Streit* and other Ninth Circuit decisions

16 disagreeing with the California Court of Appeal in *Peters*, the

17 California Supreme Court published a decision holding that the

18 Ninth Circuit decision misperceived California law on the subject

19 and that *Peters* was correctly decided.  In *Venegas v. County of Los

20 Angeles*, 32 Cal.4th 820 (2004), the California Supreme Court held

21 that a sheriff acted as a state agent when performing law

22 enforcement duties.  Therefore, he and his department were

23 absolutely immune from a §1983 damages action.  In *Venegas*, a

24 couple brought a civil action against a county, its sheriff, and

25 his department, alleging §1983 causes of action.

26      A sheriff whose agency conducts a criminal investigation, held

27 *Venegas*, acts on behalf of the state government while performing

28 such law enforcement activities.  The sheriff is acting as a state

government agent and is therefore absolutely immune from civil prosecution for asserted federal civil rights violations in §1983 actions. California constitutional and statutory provisions demonstrate that the sheriff operates under the auspices and supervision of the state attorney general. The latter represents the state, not the county. He exercises law enforcement oversight in his official capacity. His supervision over sheriffs brings them within the umbrella of state government. 32 Cal.4th at 830, 833.

The state Supreme Court in *Venegas* pointed out that the California Constitution, Article 5, Section 13, provides that, subject to the powers of the Governor, it is the Attorney General who has direct supervision over every sheriff in all matters pertaining to the duties of his or her office. Government Code §12560 authorizes the Attorney General to directly supervise all sheriffs with power to order activities regarding investigations as well as to order the preparation of reports. Contrarily, county boards of supervisors have no control over a sheriff's discharge of his or her law enforcement functions. Gov. Code §25303. The elected local legislature does not tell the elected sheriff of a county how to enforce the law; to hold contrarily would cross separation of powers lines. The statute states that the board of supervisors can only control the funding of the agency, not its investigative or prosecutorial functions.

The state Supreme Court disagreed with the Ninth Circuit decisions holding to the contrary. 32 Cal.4th at 836. The *Venegas* court concluded that "the constitutional and statutory provisions discussed above, demonstrat[e] that a sheriff represents the state,

not the county, when performing law enforcement duties in his official capacity." *Id*.   *Venegas* sided with *Peters* (sheriff and his department are damages-immune state actors in the operation of a jail) over the earlier Ninth Circuit cases rejecting *Peters*. 32 Cal.4th at 839.

The *Venegas* court stated that the Ninth Circuit's analysis expressed a policy concern about overly broad immunity from suit. But that concern is extraneous to the *McMillan* court's factor-balancing test, a test which, as the Ninth Circuit acknowledged, requires a weighing of the state's Constitution, statutes, and case law.  32 Cal.4th at 838.

A local governmental unit is liable only if the alleged deprivation of rights implements or executes *its* policy, practice, or custom.  Because the actions and policies at issue in this case are not official policies of the County of Ventura, because the Ventura County Sheriff, Bob Brooks, acts in his capacity as a state official rather than a local policymaker for the County, the County of Ventura is not liable to suit under §1983.  *McMillian, supra,* 520 U.S. at 783.

G.   The State-law Theories Fail for Three Reasons:

1.   There Is No Evidence of Fault upon Which a State-Law Cause of Action Must Rest.

Absent any indication of misconduct, no theory is viable against municipal officials or defendants.  Without any violation of a person's rights, there is no conduct upon which to base any claim under the law.  *Thompson v. County of Los Angeles*, 142 Cal.App.4th 154, 173 (2006); *City of Simi Valley v. Superior Court*, 111 Cal.App.4th 1077, 1085 (2003).

In the present case, there was no custodial or medical fault. The plaintiff fully concedes that the jailers could not have known of or impeded the sudden attack upon him (p. 169:23-25).  He also testified that he received immediate medical attention, next-day X-rays, results thereof two days later, and oral maxillofacial surgery two days after that, which was his first demand for advanced medical treatment.  He ruled out the four days between the attack and the surgery as causing harm beyond that already suffered in the inmate-on-inmate attack (p. 179:14-25; p. 180:1-3).

2.    Municipalities Are Immune from State-Law Causes of Action Arising from Injuries to Jail Inmates.

California Government Code §844.6(a)(2) provides that a public entity is not liable for an injury to any prisoner.  Therefore, the County of Ventura, the Ventura County Sheriff's Department, and Sheriff Bob Brooks are not liable, as they are immune from claims by a prisoner, such as the plaintiff, arising from jail injuries.

In the case of *Badiggo v. County of Ventura*, 207 Cal.App.3d 357 (1989), a personal injury action was brought against a county by a plaintiff who was injured in a work furlough facility.  The appellate court held that his action was barred by statute, which immunizes public entities for injuries caused to any prisoner. Plaintiff was restrained at the facility and not permitted to leave except to go to work, thus making the plaintiff a statutory prisoner.  *Id*. at 361.

3.    There Is No Proximate Cause.

Defendants incorporate by reference their discussion contained at page 12, lines 26-27, and page 13, lines 1-19, hereat.

/ / /

4.    The Court Has Jurisdiction to Rule on the State-law Causes of Action in this Proceeding Because They Arise from the Same Common Nucleus of Operative Facts.

A district court correctly asserts pendent jurisdiction, also known as supplemental or ancillary jurisdiction, over non-federal theories which derive from a common nucleus of operative facts. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1359 (9th Cir. 1988).  A test to determine that issue is whether the claims are such that a plaintiff would ordinarily be expected to try all of them in a single judicial proceeding.  *Id*.  The *Marcos* court held, "The power of a federal court to decide pendent claims is wide-ranging." *Id*.  While the exercise of the power is discretionary, ordinarily the power will be exercised if it exists.  *Id*. Only exceptionally is federal jurisdiction not employed where applicable.  *Id*.

In the present case, plaintiff has asserted seven pendent or supplemental state claims under the fourth through tenth causes of action.   These are inextricably intertwined with the facts of allegedly not protecting plaintiff from the inmate attack and allegedly not providing sufficient or sufficiently prompt medical care to him.   All of the causes of action are simply different names for trying to vindicate those two alleged primary rights.

But as the defendants have shown in this points and authorities and the statement of uncontroverted facts/separate statement of undisputed facts, there is no viable cause of action. While that can be derived from the universe of facts contained in the statement of undisputed facts, it is more summarily indicated in the plaintiff's answer to both questions in his deposition.  On

page 169, lines 23-25, and page 170, line 1, plaintiff answered "no" to the question of whether there was anything which the deputies could have done to have stopped the inmates' attack upon him.  He also answered at page 179, lines 14-25, and page 180, lines 1-3, that the delay in treatment did not make his jaw any worse than the blow from the inmate who attacked him.

There is no liability under these state-law causes of action. Therefore, they too should be dismissed with prejudice.

## II.

### SUMMARY STATEMENT OF COUNTERCLAIMS AND AFFIR-MATIVE DEFENSES

There are none.

## III.

### ELEMENTS REQUIRED TO ESTABLISH DEFENDANT'S COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

Not applicable.

## IV.

### DESCRIPTION OF KEY EVIDENCE RELIED UPON IN SUPPORT OF EACH COUNTERCLAIM AND AFFIRMATIVE DEFENSE

Inapplicable.

## V.

### IDENTIFICATION OF ANY ANTICIPATED EVIDENTIARY ISSUES

None are currently expected.

/ / /

/ / /

/ / /

## VI.

### IDENTIFICATION OF ISSUES OF LAW GERMANE TO THE CASE

None, other than stated in Section II.

## VII.

### BIFURCATION OF ISSUES

None is requested.


Dated:  April ____, 2010

                          LAW OFFICES OF ALAN E. WISOTSKY


                          By:_____
                             JEFFREY HELD
                             Attorneys for Defendants,
                             COUNTY OF VENTURA, VENTURA
                             COUNTY SHERIFF'S DEPARTMENT, and
                             SHERIFF BOB BROOKS